HELEN KNITTEL, appellant,

v.

CHARLES A. KNITTEL, respondent.·

[Decided July 13th, 1917.]

On appeal from a decree of the court of chancery advised by
Advisory Master Thompson, who filed the following opinion:

The petition is filed by the wife charging the husband with
having committed adultery with three different women, un-
known to the petitioner, in Atlantic City, New Jersey, at dif-
ferent times during the summer of 1916, and specifically charges
the defendant with having committed adultery with one Kitty
Murray, in Atlantic City, on September 19th, 1916.   During
the hearing the petitioner asked for leave to amend the petition
and charge the defendant with having committed adultery with
three other women, names unknown, during July and August,
1914, in Atlantic City, at 15 South Carolina avenue.

The defendant in his answer denies the charges in the peti-
tion, and for defence says that the petitioner condoned the
offence with knowledge of said supposed acts of adultery and
they continued their matrimonial relations and they cohabited
up to and including September 5th, 1916; and as a further de-
fence charges that in said supposed acts of adultery the peti-
tioner connived and deliberately sought to entrap the defendant
to commit adultery by procuring the parties named in the peti-
tion to invite the defendant to commit adultery. ·

The parties were married in Atlantic City, New Jersey, on
December 12th, 1911, and have lived in Atlantic City continu-
ously.   There were two children born of their marriage—Eliza-
beth aged four years, and Helen aged one year.

The petitioner has an income, independent of her husband, of
$5,000 per year.   Her mother also contributed towards her sup-

port. Her husband allowed her $17 per week, and in his testimony claimed that was all he could afford to give her, which statement is uncontradicted. The husband was engaged in the real estate business in Philadelphia and Atlantic City, dividing his time between the two offices.

In support of the charges in the petition with respect to adultery with three different unknown women during the summer of 1916, several witnesses were examined, generally detectives employed by Mrs. Knittel to watch Mr. Knittel, who was in the habit of bathing, walking and sitting on the beach with different women during the summer of 1916. The petitioner's witnesses say, and also Mrs. Knittel, on at least one occasion, that Mr. Knittel's conduct toward these women, both in the water and on the beach, was common and vulgar, and that he had his hands on their breasts and legs. This is not denied by the defendant, but, on the contrary, he admits part of these charges, but denies that he ever committed adultery with any of them. On these occasions there was clearly an inclination on his part to commit adultery, but no opportunity so far as shown by the testimony. The beach and boardwalk were crowded with bathers and sightseers when he was in company with these women.

The charges alleged in the amendment to the petition that the defendant committed adultery at a house number 15 South Carolina avenue with women unknown to the petitioner during July and August, 1914, is denied by the defendant. The testimony offered to support these charges was confined to one witness, Frank Wade, who says he was a roomer in the house during the summer, and on three separate occasions saw Mr. Knittel in the house with as many different women; that the house was run for immoral purposes, and that defendant came there at night and occupied, on each occasion, a room next to his room, and he saw him through a hole in the door between the rooms, and the lights were on, and that he saw and heard him, and that he had sexual intercourse on these occasions, and that he remained in the room for several hours. When asked how he knew that it was Mr. Knittel that was there with these women, he said that Mrs. Harrison, who kept the house, told him that it was Mr. Knittel when he came in with a girl. Later, during

his testimony, he said that he had known the defendant before he saw him at the house, and that they had drank together at several different saloons and hotels. This witness was brought into the case by George Herbert, a detective employed by the petitioner to secure evidence against her husband. His direct testimony did not impress me with its truthfulness, and after the conclusion of his cross-examination, from the manner he had conducted himself and his general appearance and actions, I was convinced there was no confidence to be placed in any statement he made. A man as anxious as he showed himself to be in telling of his own conduct, depravity and licentiousness must be inherently wrong in his whole make-up and entirely without responsibility, and without any corroboration must be disbelieved. The defendant denied that he was ever in the house and that he ever knew the witness, and says he never saw him until in court that day. I must believe the defendant's statement in this respect.

The petitioner produced a colored man, James Lewis, as a witness, who had been employed by the defendant's mother as a chauffeur. On cross-examination the witness said he left Mrs. Knittel's (defendant's mother) employment because he

"didn't feel like working around Mrs. Knittel's house, knowing that Mrs. Knittel told me every day that her son Charlie was innocent of this case, coming in and talking to me about that, and I knowing he was guilty of it, and been treating me very funny, and I say to myself I don't like to work for people that way, I know what had been going on around the house, and I didn't feel that I should stay there, so I left."

And he later said:

"I didn't like to work for this kind of people.
"Q. Why not?
"A. Because I don't know if people do things like that they could say that—won't say that his mother, either one, I don't know about her—but he could say that I taken a tire off the car and sold it, or any kind of thing."

This witness testified that on several occasions, at night, he took the defendant out in his mother's automobile and he met and took in the car women from the street and took them to

saloons and out-of-the-way places. The defendant denies the statement made by this witness and says that he was discharged by his mother under suspicion that he had stolen $43 in money left by her in her automobile. Without special reference to this testimony, I was not impressed by his manner on the witness-stand and cannot accept his statements as true. At a subsequent hearing I requested the production of this witness in order that I might personally further examine him. It was claimed by Mr. Herbert, the detective, that the day before he had left Atlantic City and probably gone to Washington, and that he had tried to reach him by telegraph but had failed. At the time this witness gave his testimony, and for some days afterwards, in fact, up to the time it is said he went to Washington, he had been employed by Detective Herbert in teaching him how to run his automobile.

There is one direct charge of adultery with Kitty Murray, so named in the petition, on September 19th, 1916, which is still left to be considered. Most of the testimony in this case is directed to this specific charge and is by far the most important in the petition from my viewpoint.

Kitty Murray was not her right name. It was Kitty Abrams, as appears from the testimony of Mr. Garrison, the petitioner's solicitor, who knew her and had represented her in two suits he had previously brought for her, one of which was then pending but in process of settlement. The defendant says in his answer, "petitioner connived and deliberately sought to entrap the defendant to commit adultery." Kitty Abrams was subpœnaed by the defendant but failed to appear and answer the subpœna. She is now supposed to be beyond this jurisdiction. The last known of her was after the first hearing in this case, when the mother of Kitty Abrams called Mr. Garrison on the telephone and told him she had been offered money to testify in behalf of the defendant. She was then supposed to be in Philadelphia.

The defendant, by invitation from Kitty Abrams over the telephone, went to number 512 Oriental avenue, Atlantic City, on the evening of September 19th, 1916. She and her mother had an apartment on the ground floor of that building. It was located on the corner of Oriental avenue and an alley. There

were at least two doors by which the apartment could be entered, one on Oriental avenue, the other from the alley in the rear. So far as it appears from the testimony, Kitty Abrams must have been alone that night in the apartment. The defendant says he first met Kitty Abrams at his office. She and her mother came there and wanted to rent an apartment through him. She came there the second time and he made an appointment to meet her on that same day, which was Saturday, on the beach and bathe with her. During the day of September 19th she called him on the telephone and made the appointment to meet him that evening between eight and eight-thirty at her apartments, 512 Oriental avenue. He further says that he went there, rang the bell, and was admitted by Kitty Abrams. She took him through the apartment and then to a bedroom where he removed his coat, vest, trousers and underdrawers, and she removed some of her clothing, then stepped out of the bedroom to turn out the light, came back and pretended to lock the door. At about that time George Herbert, the detective, Miss McGowan, an assistant detective, Edmund J. Shaw and the petitioner came in the room; that he was sitting on a chair and his wife said to him, "Give me the key to the house." The Herbert party then left the room and the house and he then came out of the room and went away. The defendant denies that he had sexual intercourse with Kitty Abrams at that time. Unquestionably, however, he went there for that purpose. The defendant, as a matter of fact, denies that he had ever at any time since his marriage been untrue to his wife.

Kitty Abrams rented the apartment 512 Oriental avenue, which was furnished, for eight months, as shown by this testimony of the owner of the property. She paid one month's rent in advance and left about the end of the month without notifying the owner, not even surrendering the keys. Before she and her mother rented the apartment they had rented rooms at number 11 South Mt. Vernon avenue from Mrs. Della Clark. Mrs. Clark knew her by the name of Kitty Murray at that time. They moved from Mrs. Clark's rooms to 512 Oriental avenue. When they left they owed Mrs. Clark for room rent $16.50. She did not know where they were going, but had one of her nephews

follow the wagon that removed some of their things from the rooms that they had occupied, and through this she learned where they were then living. Mrs. Clark wanted her money and says Kitty Abrams told her she was to meet a man in her apartment for the purpose of having his wife come there and catch them together. She says she had called him up on Monday and made an appointment for him to come to her apartment on Tuesday night, between eight and eight-thirty, and she would get $200 if they pulled the trick off, and she would then pay her. The next day after Tuesday the 19th she came to Mrs. Clark and paid her $16.50, and at that time exhibited a roll of bills and claimed that she was paid $200 for pulling off the trick. Mrs. Clark says that on the Sunday morning before Kitty Abrams vacated her rooms, which she did on Monday, a man came to the house who answers the description of Detective Herbert and asked for Mrs. Abrams. She told Mrs. Abrams and Mrs. Abrams said, "Tell him to step in the bedroom," that he was her cousin, and the party went in the bedroom, and as she was passing back through to the bath she heard him say, "I saw you. I saw you when you met him." And he said something about being on the pier. I believe that man was George Herbert. She says she saw this man on the night of September 19th in the apartment with another man at 512 Oriental avenue; later he came out alone and went away and returned with two women a few minutes later. Shortly after that the defendant (whom she did not know at that time) came and entered the apartment. Soon after this the Herbert party came out and later the defendant, and that one of her nephews, who was with her watching the house, went up to the defendant and called him by name, "Charlie Knittel." Mrs. Clark says that she went to Oriental avenue and took her two nephews with her for the purpose of trying to protect the person whom she did not know from getting in trouble. She says: "I went up there for the full purpose of putting this man wise, for I thought it was a shame to break up a home." Her two nephews Claude L. Clark and Phineas Long corroborate her statement as to what occurred outside of the apartment that night. All of these three witnesses, from their manner in giving testimony and their appearance and

actions on the witness-stand, impressed me with the truthfulness of their statements. I believe Mrs. Clark went there for the purpose which she states. They all testified they did not warn the defendant, as they had intended, as they did not know who it was that was to come there in advance, and that he came from a direction and approached the apartment away from them and entered the apartment quickly and they did not have time to warn him.

George Herbert was employed by the petitioner to secure evidence against her husband. He had watched him from time to time during the summer on the beach bathing with different women, and had observed his conduct toward these women, and he and other witnesses, including Mrs. Knittel, described his actions. Part of this was admitted by the defendant on his direct examination. The testimony shows that Mr. Herbert was well paid for his services. He also had other operatives of his at this work. Mr. Herbert had made an investigation which concerned Kitty Abrams and her mother in relation to an accident, which suit had been brought by Mr. Garrison for them against the Shill Rolling Chair Company. Mr. Herbert says that on the morning of September 19th he was going to Mr. Garrison's office and Kitty Abrams was passing out of Mr. Garrison's office. He said to Mr. Garrison that she, meaning Kitty Abrams, was in Knittel's office and Mr. Garrison said:

"Well, she told me that she had a broker putting up for her and that she had a date with him that night, and that he would not be surprised that if Knittel was not the man, because she would go with anybody."

Herbert says he followed her and ascertained where she lived. He notified two or three other parties of the supposed meeting that night, including Mrs. Knittel, the petitioner. They went up to Oriental avenue and they all say found the back door unlocked and entered the house through that door, went in and hid, and saw the defendant and Kitty Abrams come through the room where they were concealed and went to the bath room for a moment, and that Kitty Abrams struck a match as they were passing through the room, and a few minutes later they all went to the bedroom. Mr. Herbert opened the door, which was

unlocked, and went in and found the defendant and Kitty Abrams, and that defendant had on only an undershirt, and Kitty Abrams had removed part of her clothing. Mrs. Knittel said to her husband, "What are you doing here in this shape?" And she said, "Give me the key to my house." The defendant gave her the key and they left. In this party was Mr. Herbert, Mrs. Knittel, Miss McGowan and Mr. Shaw. All of these parties testified to about the same thing with respect to the visit to the apartment. Apparently, from their statement, all of the doors of the house were unlocked, the rear door and the bedroom door, and evidently the front door, as they say they went out that way. Mrs. Clark, Mr. Clark and Mr. Long all testified that shortly after Mr. Herbert, Mrs. Knittel, Miss McGowan and Mr. Shaw had entered the apartment Kitty Abrams came out on the front in the street and walked up and down and appeared to be watching for somebody, and that she did this several times. I am forced to the conclusion that the Herbert party was concealed in the apartment expecting Mr. Knittel to come, and that Kitty Abrams was impatiently waiting for him as shown by her anxiety in going to the door and looking out. Mrs. Clark and her two nephews all testified positively that the Herbert party used only the front door in going in the building and coming out; that someone came out, as the testimony shows was Mr. Herbert; that he went away and came back with two women, which the testimony shows were Mrs. Knittel and Miss McGowan, and that they entered the apartment through the front door, and when they finally left the building they went out through the front door. I believe this to be true, and not the statement made by Mrs. Knittel and her witnesses.

From all the facts and circumstances shown in this case I am entirely convinced that all of this had been prearranged, that Kitty Abrams had been employed to lure the defendant to her apartment, and that she and they connived at the act of adultery. They were all there in good time. They were concealed in the apartment, even according to their own testimony, at the time Mr. Knittel came there, and when Mr. Herbert evidently concluded that the time had arrived for going in the bedroom he was there promptly followed by the other parties. Before that

Kitty Abrams had invited him to remove his clothing. She had removed part of hers, everything staged for the entry of the Herbert party. The detective had finished his job and it was so well done that the petitioner, according to her own testimony and Herbert's testimony, paid him $500 more than she had agreed to.

I cannot believe that the testimony of Mrs. Clark, Claude A. Clark and Phineas Long as to what they say occurred that night is false. Mrs. Clark must have known from someone that the defendant was going to that house on the night of September 19th, and she must have obtained that information, as she says, from Kitty Abrams herself. I do not believe it was a mere chance that the detective, Herbert, was taking chances from the information he says he got from Mr. Garrison's office on the morning of the 19th that induced him to go there that night and arrange to have Mr. Shaw go with him, and arrange with Miss McGowan, his assistant, to have her go down and bring Mrs. Knittel up town that night and take them all to this apartment, unless he was sure the defendant would be there too.

Connivance to have the defendant commit adultery is clearly shown to my mind by every fact and circumstance in the case and admits of no substantial doubt.

My conclusions are a decree should be entered refusing the divorce prayed for.

*Messrs. Garrison & Voorhees* and *Messrs. Bourgeois & Coulomb,* for the appellant.

*Mr. Martin E. Keffer,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Advisory Master Thompson.

*For affirmance*—GARRISON, SWAYZE, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—11.

*For reversal*—None.